IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

DUSTIN A. HILL,            )
                                    )
        Plaintiff,       )
                                    )
    v.                   )     CIVIL ACTION NO. 1:09CV77-SRW
                                    )           (WO)
MICHAEL J. ASTRUE, Commissioner  )
of Social Security,         )
                                    )
        Defendant.    )

## MEMORANDUM OF OPINION

Plaintiff Dustin Hill brings this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) seeking judicial review of a decision by the Commissioner of Social Security ("Commissioner") denying his application for Supplemental Security Income under the Social Security Act.[1] The parties have consented to entry of final judgment by the Magistrate Judge, pursuant to 28 U.S.C. § 636(c). Upon review of the record and briefs submitted by the parties, the court concludes that the decision of the Commissioner is due to be affirmed.

## BACKGROUND

On September 14, 2004 (protective filing date), plaintiff's mother filed an application for Supplemental Security Income (SSI), alleging that plaintiff has been disabled since birth due to functional limitations caused by mental impairments. (R. 55, 69). She reported that

---

[1] Plaintiff was born on August 23, 1989. The present application was filed in September 2004, when plaintiff was fifteen years old, and the ALJ's decision issued in October 2006, when plaintiff was seventeen. (R. 30, 55-57). When plaintiff filed the present action in January 2009, he was nineteen years old. (Doc. # 1). Plaintiff proceeds on his own behalf before this court, but the underlying claim is one for childhood disability, filed by plaintiff's mother.

while he was then attending school full-time, he could not "handle being around large groups of people" and had "anxiety attacks when he's around large crowds." (R. 63). She indicated that he was unable to deliver phone messages, repeat stories he had heard, tell jokes or riddles accurately, explain why he did something, or talk with friends. She stated, "He does not have friends and is considered a loner." (R. 63). She further reported that he was unable to "read and understand sentences in comics and cartoons," "read and understand stories in books, magazines or newspapers," or "understand, carry out, and remember simple instructions" and that he could not drive a car or play sports. (R. 64). Plaintiff's mother indicated that plaintiff did not have friends his own age and was unable to make new friends; did not generally get along with her or other adults, his siblings or his school teachers; and was unable to play team sports. (R. 65). She indicated that his ability to pay attention and stick with a task was limited. (R. 67). In the category of taking care of his personal needs and safety, plaintiff's mother indicated that plaintiff was able to do only one of the thirteen listed functions, *i.e.*, that he "[g]ets to school on time." (R. 66).

The ALJ rendered a decision on October 26, 2006, in which he found that plaintiff has not been disabled, as defined in the Social Security Act, since September 14, 2004, the date his SSI application was filed. (R. 19-30). On December 24, 2008, after considering additional evidence filed by plaintiff,[2] the Appeals Council denied plaintiff's request for

---

[2] At the Appeals Council level, plaintiff filed: (1) an October 24, 2006 mental RFC form completed by his treating psychiatrist; (2) treatment notes for four office visits to plaintiff's pediatrician during the period from September 30, 2006 to November 29, 2006, showing that plaintiff sought treatment three times for congestion and cold symptoms and once for diarrhea; and

review. (R. 8-11).

## STANDARD OF REVIEW

The court's review of the Commissioner's decision is narrowly circumscribed. The court does not reweigh the evidence or substitute its judgment for that of the Commissioner. Rather, the court examines the administrative decision and scrutinizes the record as a whole to determine whether substantial evidence supports the ALJ's factual findings. Davis v. Shalala, 985 F.2d 528, 531 (11th Cir. 1993); Cornelius v. Sullivan, 936 F.2d 1143, 1145 (11th Cir. 1991). "Substantial evidence is more than a scintilla, but less than a preponderance. It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983). Factual findings that are supported by substantial evidence must be upheld by the court. See Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990)("Even if the evidence preponderates against the [Commissioner's] factual findings, we must affirm if the decision reached is supported by substantial evidence."). The ALJ's legal conclusions, however, are reviewed *de novo* because no presumption of validity attaches to the ALJ's determination of the proper legal standards to be applied. Davis, 985 F.2d at 531. If the court finds an error in the ALJ's application of the law, or if the ALJ fails to provide the court with sufficient reasoning for determining that the proper legal analysis has been conducted, the ALJ's decision must be reversed. Cornelius, 936 F.2d at 1145-46.

---

(3) treatment notes from plaintiff's March 12, 2003 routine visit to his optometrist, during which glasses were prescribed. (R. 11, 433-455).

# DISCUSSION

## Analysis of Childhood Disability Claims

"Federal regulations set forth the process by which the SSA determines if a child is disabled and thereby eligible for disability benefits." Shinn ex rel. Shinn v. Commissioner of Social Sec., 391 F.3d 1276, 1278 (11th Cir. 2004) (citing 42 U.S.C. § 1382c(a)(3)(C)(I) and 20 C.F.R. § 416.906). "The process begins with the ALJ determining whether the child is 'doing substantial gainful activity,' in which case she is considered 'not disabled' and is ineligible for benefits." Id. (citing 20 C.F.R. §§ 416.924(a), (b)). "The next step is for the ALJ to consider the child's 'physical or mental impairment(s)' to determine if she has 'an impairment or combination of impairments that is severe.'" Id. (citing 42 U.S.C. §§ 416.924(a), (c)). "For an applicant with a severe impairment, the ALJ next assesses whether the impairment 'causes marked and severe functional limitations' for the child." Shinn, 391 F.3d at 1278 (citing 20 C.F.R. §§ 416.911(b), 416.924(d).) This determination is made according to objective criteria set forth in the Code of Federal Regulations (C.F.R.). As the Eleventh Circuit has explained,

> [t]he C.F.R. contains a Listing of Impairments ["the Listings", found at 20 C.F.R. § 404 app.] specifying almost every sort of medical problem ("impairment") from which a person can suffer, sorted into general categories. See id. § 416.925(a). For each impairment, the Listings discuss various limitations on a person's abilities that impairment may impose. Limitations appearing in these listings are considered "marked and severe." Id. ("The Listing of Impairments describes ... impairments for a child that cause[ ] marked and severe functional limitations.").
>
> A child's impairment is recognized as causing "marked and severe functional limitations" if those limitations "meet[ ], medically equal[ ], or functionally equal[ ] the [L]istings." Id. § 416.911(b)(1); see also §§ 416.902,

4

416.924(a). A child's limitations "meet" the limitations in the Listings if the child actually suffers from the limitations specified in the Listings for that child's severe impairment. A child's limitations "medically equal" the limitations in the Listings if the child's limitations "are at least of equal medical significance to those of a listed impairment." Id. § 416.926(a)(2).

Id. at 1278-79. "Finally, even if the limitations resulting from a child's particular impairment are not comparable to those specified in the Listings, the ALJ can still conclude that those limitations are 'functionally equivalent' to those in the Listings.   In making this determination, the ALJ assesses the degree to which the child's limitations interfere with the child's normal life activities. The C.F.R. specifies six major domains of life:

> (i) Acquiring and using information;
>
> (ii) Attending and completing tasks;
>
> (iii) Interacting and relating with others;
>
> (iv) Moving about and manipulating objects;
>
> (v) Caring for [one]self; and
>
> (vi) Health and physical well-being."

Shinn, 391 F.3d at 1279 (citing 20 C.F.R. § 416.926a(b)(1)). "The C.F.R. contains various 'benchmarks' that children should have achieved by certain ages in each of these life domains." Id. (citing 20 C.F.R. §§ 416.926a(g)-(l)). "A child's impairment is 'of listing-level severity,' and so 'functionally equals the listings,' if as a result of the limitations stemming from that impairment the child has 'marked' limitations in two of the domains [above], or an

5

'extreme' limitation in one domain." Id. (citing 20 C.F.R. § 416.926a(d) and § 416.925(a)).[3]

Additionally, a child is not disabled within the meaning of the Social Security Act unless the impairment or combination of impairments which meets, medically equals or functionally equals the listings either has lasted or can be expected to last for a continuous period of twelve months or to result in death.   42 U.S.C.A.  §  1382c(a)(3)(C)(i)("An individual under the age of 18 shall be considered disabled for the purposes of this subchapter if that individual has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."); 20 C.F.R. § 416.924 ("If your impairment(s) is severe, we will review your claim further to see if you have an impairment(s) that meets, medically equals, or functionally equals the listings.   If you have such an impairment(s), and it meets the duration requirement, we will find that you are disabled. If you do not have such an impairment(s), or if it does not meet the duration requirement, we will find that you are not disabled."); Cf. Barnhart v. Walton, 535 U.S. 212 (2002)(upholding, in the adult disability context, the Commissioner's regulatory interpretation that it is the inability to engage in substantial gainful activity, rather than the impairment(s), which must meet the 12 month duration

---

[3] " A 'marked' limitation is defined as a limitation that 'interferes seriously with [the] ability to independently initiate, sustain, or complete activities,' and is 'more than moderate.'" Henry v. Barnhart, 156 Fed.Appx. 171, 174 (11th Cir. 2005) (unpublished) (citing 20 C.F.R § 416.926a(e)(2)(I)). "An 'extreme' limitation is reserved for the 'worst limitations' and is defined as a limitation that 'interferes very seriously with [the] ability to independently initiate, sustain, or complete activities,' but 'does not necessarily mean a total lack or loss of ability to function.'" Id. (citing 20 C.F.R. § 416.926a(e)(3)(I)).

requirement).

## The ALJ's Findings

The ALJ found that plaintiff suffers from "severe" impairments of "attention deficit hyperactivity disorder ('ADHD'), reactive airways disease, obsessive compulsive disorder, bipolar disorder, overanxious disorder, irritable bowel syndrome, mathematics disorder, and mood disorder due to medical condition[,]" but that he does not have an impairment or combinations of impairments which meets, medically equals or functionally equals an impairment in the listings. (R. 22)  In reaching his conclusion at the "functional equivalence" step, the ALJ found that plaintiff has no limitation in the domains of "caring for yourself" and "moving about and manipulating objects."  He concluded that plaintiff has "less than marked" limitations in "attending and completing tasks," "acquiring and using information," "health and physical well-being," and "interacting and relating with others."  (R. 25-29).

## Plaintiff's Contentions

The specific issues identified by plaintiff are: (1) "Whether the ALJ erred as a matter of law when he failed to find that [plaintiff] functionally equals the listings?" and (2) "Whether the new evidence presented to the appeals council from [plaintiff's] treating psychiatrist, Dr. Nelson Handal, warrants remand?"  (Plaintiff's brief, p. 1).

## New Evidence

Plaintiff argues that the "new evidence presented to the Appeals Council from [his] treating psychiatrist, Dr. Nelson Handal, warrants remand . . . back to the ALJ to consider this evidence when assessing [plaintiff's] claim."  (Plaintiff's brief, pp. 11, 14).  Plaintiff

contends that Dr. Handal's mental RFC form warrants remand because: (1) it is new and non-cumulative evidence; (2) which is "material" because the opinion expressed on the form would likely change the administrative outcome; and (3) he has demonstrated "good cause" for his failure to submit the form to the ALJ before the ALJ rendered his decision.  (Id., pp. 11-14).  The Commissioner responds that the "new evidence" does not warrant remand because plaintiff "has made no . . . showing" that the "submitted evidence could reasonably be expected to change the ALJ's determination," *i.e.*, that it does not satisfy the materiality prong of the new evidence standard.  (Commissioner's brief, pp. 10-11).  In reply, plaintiff insists that he has satisfied the standard for a "new evidence" remand. (Plaintiff's reply brief).

The "new evidence" standard about which the parties argue, however, is not relevant to this case.  That standard derives from sentence six of 42 U.S.C. § 405(g), which provides that "[t]he court may . . . at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding[.]" 42 U.S.C. § 405(g).  Evidence is not "new" for purposes of sentence six, however, if it is presented at any stage of the administrative proceedings; it is "new" only if it is presented for the first time at the district court level.  In Ingram v. Commissioner of Social Security, 496 F.3d 1253 (11th Cir. 2007), the Eleventh Circuit explained that "[s]entence six allows the district court to remand to the Commissioner to consider previously unavailable evidence; *it does not grant a district court the power to*

8

*remand for reconsideration of evidence previously considered by the Appeals Council*." Id. at 1269 (emphasis added). The court stated, "Because evidence properly presented to the Appeals Council has been considered by the Commissioner and is part of the administrative record, that evidence can be the basis for only a sentence four remand, not a sentence six remand." Id.[4] Accordingly, the plaintiff's argument that he is entitled to remand because he has satisfied the requirements of the "new evidence" standard is without merit.

### The Adequacy of the Commissioner's Decision

The court construes plaintiff's argument to be that the Commissioner's decision is not supported by substantial evidence because the evidence of record – including the evidence first submitted to the Appeals Council – demonstrates that the limitations caused by

---

[4] Plaintiff devotes much of his brief and all of his reply to arguing for a "new evidence" remand (*i.e.* a "sentence six" decision). However, in the "Conclusion" sections of both briefs, plaintiff seeks *reversal* and remand (*i.e*, a "sentence four" decision). (Plaintiff's brief, p. 14; Plaintiff's reply brief, p. 5). In his reply, plaintiff cites Ingram in support of his argument that he has satisfied the "good cause" prong of the standard for a "new evidence" remand. (Plaintiff's reply brief, pp. 4-5). Plaintiff has conflated the sentence four and sentence six analyses. The portion of the Ingram decision on which plaintiff relies pertains to the Eleventh Circuit's holding that the district court must consider evidence first submitted to the Appeals Council when performing its review pursuant to *sentence four* of 42 U.S.C. § 405(g) – *i.e.*, when "it decides whether to 'enter a judgment affirming, modifying, or reversing the [Commissioner's denial of benefits], with or without remanding the cause for a rehearing.'" (Ingram, 496 F.3d at 1257-58, 1261-67). As the Ingram court observes, sentence four and sentence six remands are "'entirely different kind[s] of remand[s.]'" Id. at 1267 (citations omitted). The Ingram court also explained that a district court is not empowered to do what plaintiff suggests in this case, *i.e.*, "remand this case back to the ALJ" for further consideration. (See Plaintiff's brief, p. 14; Ingram, 496 F.3d at 1269 ("Although section 405(g) allows a remand to 'the Commissioner,' there is no provision in law for a court to remand 'to the ALJ[.]' When a court remands to the Commissioner, under section 405(g), the remanded case returns to the Appeals Council, which may, in its discretion, then remand the case to the administrative law judge.")).

plaintiff's impairment(s) functionally equal the criteria of the listings.[5]  Plaintiff contends that

he suffers from a "marked" limitation in three domains – attending and completing tasks,

acquiring or using information, and interacting and relating with others.  (Plaintiff's brief,

pp. 7-11).[6]  If plaintiff establishes that – during the relevant period and for the duration

required by the Act – he was markedly limited in two or more of the domains, he is entitled

to a finding of disability on the basis of functional equivalence.[7]  The ALJ found plaintiff to

be limited in each of the three contested functional domains, but determined that his

limitation was at a "less than marked" level. (R. 25, 26, 27).

<u>The Evidence</u>

The treatment notes from Dothan Pediatric Clinic show that plaintiff has been treated

------

[5]  Plaintiff alleges no error at the earlier steps of the sequential analysis and the court has found none.  Although he contends that the ALJ "erred as a matter of law," he has identified no specific legal error.  Aside from his argument – rejected above– that he is entitled to remand because he has produced evidence satisfying the "new evidence" standard, plaintiff's brief is limited to a discussion of how the evidence of record weighs against the ALJ's conclusions regarding the degree of plaintiff's limitation in three domains he identifies.  (<u>See</u> Plaintiff's brief).

[6]  At various points in the eight-year period documented by the medical evidence of record, plaintiff has been diagnosed with a variety of physical ailments.  Plaintiff has listed each of these diagnoses in his brief at pages 2-4, along with those pertinent to his mental limitations.  Plaintiff does not argue that his physical limitations have any bearing on the domains of attending and completing tasks, acquiring and using information, or interacting and relating with others, and he alleges no error in the Commissioner's treatment of the remaining three domains (moving about and manipulating objects, caring for himself, and health and physical well-being). Although plaintiff lists all of his physical diagnoses in his summary of the evidence, he discusses only the evidence pertaining to his mental limitations.  (<u>See</u> Plaintiff's brief, pp. 4-14).  Accordingly, while the court has considered all of the evidence of record, the court does not discuss or refer to the medical evidence relating to plaintiff's physical impairments and limitations, even where treatment records for a particular date discuss both physical and mental impairments.

[7]  Plaintiff does not contend that he has an "extreme" limitation in any functional domain.

10

for symptoms of Attention Deficit Disorder since sometime before April 1998, when he was eight years old; that he began seeing Dr. Handal at Dothan Behavioral Medicine Clinic in 1998 for management of his ADD/ADHD; and that he was treated with various medications at various dosages over the next few years.  (Exhibit 1F, 13E).  At plaintiff's "well child" check-up on November 1, 2000, Dr. Benak listed mental assessments of ADHD and "anxiety reaction."  Under "history," he indicated that plaintiff was "doing well" and having "[n]o problems."  Under the heading of "developmental/behavioral," Dr. Benak noted, "He is doing fairly well in school.  He has had a problem with attention deficit hyperactivity disorder.  He is presently on Concerta, Remeron and Bentyl.  He also has anxiety disorders.  He is in the 6th grade."  (R. 219-20).  The notes for plaintiff's well-child checkup in April 2001 state that "[h]is ADHD is under good control and he has been able to concentrate in school making mostly As and Bs.  His anxiety is under good control."  Plaintiff was then taking Concerta, 36 mg, and Remeron.  Dr. Warner noted that he was "[d]oing well in school.  Has friends his age.  No discipline problems."  His assessments included ADHD.  (R. 211-12).

On October 17, 2001, plaintiff sought treatment after he had difficulty catching his breath during PE.  He reportedly had stopped breathing "for about 45 seconds" but "did not pass out."  Dr. Ramsey assessed "hyperventilation."  He told plaintiff and his mother that "this probably played in with his anxiety," and noted that they were to "discuss this with Dr. Handal." (R. 208).  The treatment note for plaintiff's "well-child" check-up on March 29, 2002 indicates that his mother reported that he was "doing well and she has no concerns.  He

is currently followed by Dr. Hand[a]l and is on Concerta 54 mg tablets in the morning. He is doing very well in school." Dr. Buie referred plaintiff to Dr. Handal for continued follow-up of his ADHD. (R. 205-06). A month later, he sought treatment after he experienced "palpitations" after PE and twice at home. Dr. Warner ordered an EKG. (R. 203-04). On March 11, 2003, at plaintiff's 13-year "well child" exam, Dr. Lies noted, under "History," "Doing well on Concerta. Has appointment with Dr. Handal and needs referral. Has been on stimulant medication since 1st grade. Is now in the 8th grade." He was then on Concerta, 54 mg. (R. 195). At plaintiff's 14-year "well child" examination on January 8, 2004, Dr. Ramsey noted "Patient in 9th grade. School going well." He also noted plaintiff's good appetite and "normal sleep habits for age." (R. 188-89).

On June 25, 2004, plaintiff reported to Dr. Jerlyn McCleod at Dothan Behavioral Medicine Clinic (also Dr. Handal's practice), "for evaluation and management." Dr. McCleod noted plaintiff's mother's reports that plaintiff was "functioning well without any difficulties or mood instability" and that his appetite was good and he was sleeping well. Plaintiff's mental diagnoses on Axis I and II were: obsessive compulsive disorder, mood disorder NOS, mathematics disorder,[8] attention deficit hyperactivity disorder, overanxious disorder and borderline intellectual functioning (FSIQ 72). Dr. McCleod included a "rule out" diagnosis of Expressive Receptive Language Disorder. She continued plaintiff on Concerta 54 mg in the morning and Zoloft 25 mg at bedtime and scheduled him to return in

---

[8] None of the medical treatment notes of record appear to relate to the Mathematics Disorder diagnosis.

two months.  (R. 250-51).

On August 4, 2004, plaintiff saw CRNP Stacy Dandridge.  Nurse Dandridge noted that plaintiff was "functioning well without any difficulties or mood instability," had a good appetite and was sleeping well, and that he had started 10th grade the previous week.  She assessed his status as "Much Improved," continued him on the same medication treatment regimen (with which plaintiff's mother was "pleased") and scheduled him to return in two months.  (R. 248-49).

The following month, on September 14, 2004, plaintiff's mother filed the present application for SSI benefits.  (R. 55-57).[9]  When plaintiff next saw CRNP Dandridge on October 6, 2004, three weeks later, Dandridge noted, "Reportedly, this patient is functioning well at home.  Patient is in 10th grade and academic progress is satisfactory.  Mom reports that child has been doing well at school.  Appetite was described as 'good," per mother.  Reportedly, he is sleeping well without any complaints of disturbances."  (R. 246).  She wrote that plaintiff was "functioning well and his mood has been better . . . Mother is pleased with the current medication treatment and requested the medication protocol continue.  Patient does report anxiety more frequently than before.  Mom requested an increase in Zoloft."  (Id.)  Dandridge assessed plaintiff's status as "Improved." She continued his prescription for Concerta, increased his dosage of Zoloft, started him on Focalin and

---

[9]  The parties and the ALJ agree that the protective filing date is September 14, 2004, ten days before plaintiff's mother signed the application.  (Plaintiff's brief, p. 1; Commissioner's brief, p. 1; ALJ decision at R. 19).

scheduled him to return in a month.  (R. 246-47).

On December 15, 2004, plaintiff reported to J. Walter Jacobs, Ph.D., for a consultative psychological examination.  His mother "described the typical symptoms associated wtih ADHD" and when questioned about his OCD, reported that he "counts, he repeats himself and maintains a rigid schedule . . . [and] [y]ou can't rearrange or change things in front of him."  She reported that he experiences anxiety "before tests, in new situations and with certain teachers."  She reported that he is "in a regular class placement . . . on a 504 program,"[10] that his grades are "average," and that he "present[s] behavior problems."  On examination, plaintiff's affect was flat, he reported problems initiating sleep, and awakening with headaches.  He stated that his appetite was "okay" and his energy "poor."  He told Dr. Jacobs that he did not have "any friends."  He stated that he feels nervous in social situations and does not like to be around crowds.  He "denied having any hobbies or participating in any sports."  Dr. Jacobs noted, "He seems to have no friends of his age."  Dr. Jacobs diagnosed OCD, ADHD (combined type), mood disorder NOS, learning disorder NOS and borderline intellectual functioning and assessed plaintiff's prognosis as "poor."  (R. 252-56).[11]

---

[10] A "504" program or plan, in the education context, sets out a school's plan for providing accommodations to a student with disabilities pursuant to Section 504 of the Rehabilitation Act of 1973.  See 29 U.S.C.A. § 794(a).

[11] Plaintiff's mother also stated, in a disability report she completed in late September 2004 in support of the application for benefits, that plaintiff did not have any friends and did not play team sports.  (R. 63, 65).  By the time of his December 2004 consultative examination by Dr. Jacobs, plaintiff had sought medical treatment a few times for injuries and complaints associated with playing sports.  (See R. 202 (treatment on May 2, 2002 after he hurt his wrist playing football, R.

On December 28, 2004, plaintiff and his grandmother reported to Dr. McCleod.  He was noted to be "functioning ok at home and school" with a good appetite and no evidence of sleep disturbance or difficulties.  Plaintiff stated that he was supposed to be taking Zoloft 100 mg, but "mom worried about that and only gave him 75 mg[.]"  He reported that his panic attacks had "gotten worse" over the previous two months, with shortness of breath, heart palpitations, dizziness and sweating.  Dr. McCleod assessed his status as "Worse with anxiety[.]"  Dr. McCleod continued plaintiff's medications, increasing his Zoloft to 100 mg and scheduled him to return in two weeks.  (R. 288-89).

Plaintiff next returned to Dothan Behavioral Medicine on January 27, 2005, a month after his previous visit, seeing Ashley Bailey[12] and Dr. McCleod.  His mother reported that his appetite was "not good" and he was not sleeping well, but that he was functioning "fair"

---

373 (treatment on December 4, 2003 after he hurt his finger "playing hockey at Bob-A-Lou"), R. 180 (on September 17, 2004, near the time his mother completed the disability report, complaining of back pain and that he "plays hockey")).  One month after his evaluation with Dr. Jacobs, on January 19, 2004, plaintiff sought treatment after he hurt his knee playing hockey at school.  His pediatrician noted, "He has continued to skate on it.  It has swollen up when he practices." (R. 187; see also R. 271).  At the administrative hearing on May 31, 2006 – two and a half years after his appointment with Dr. Jacobs – plaintiff testified about a number of friends plaintiff had at the time of the hearing (Cody, Zack, Jonathan, Trey, and Jeremy), who had been his friends "since Bobbie Lee left" which, according to plaintiff's mother, had been "about five years."  Plaintiff testified that he played hockey with these friends.  (R. 481).  In addition to his treatment for sports-related injuries before and around the time of his appointment with Dr. Jacobs, plaintiff was also treated on April 14, 2004 when he hurt his hand playing hockey (R. 270, 370); on July 14, 2005 when somebody stepped on his foot while they were playing basketball (R. 324-28); on October 11, 2005 and October 13, 2005 after he sprained his knee playing hockey (R. 264, 320-23); and on February 1, 2006 when he sought treatment for pain in his right arm, reported that he played hockey, and was diagnosed with elbow tendonitis (R. 313-14).

[12] Bailey and Dr. McCleod both signed the treatment note on January 27, 2005.  Bailey's qualifications are not on the note and her name does not appear on Dothan Behavioral Medicine Clinic's letterhead, so her role in the assessment is not clear.  (See R. 286, 379, 396).

15

at home and school.  The treatment note states:

> Mother reports, "He is having aggressive verbal outburst, severe.  He threatens
> people, he hits, throws.  He doesn't want to do anything . . . go to school, mind,
> nothing.  Discipline doesn't work.  Taking things away, grounding."  He
> denies suicidal thoughts.  Patient reports, "I'm so sleepy during the day.
> Anything can set me off, too.  It[']s like I can't control it."  Mother says, "I
> love the Focalin."

(R. 285).  Plaintiff's status is indicated as "Worse[.]"  Dr. McCleod continued plaintiff's

prescriptions for Concerta and Focalin, decreased his dosage of Zoloft to 75 mg and his

Seroquel dosage by one-half, and recommended to plaintiff's mother that she get a juvenile

probation officer for plaintiff.  She scheduled plaintiff to return in a week.  (R. 285-86, 288).

     The following week, on February 3, 2005, plaintiff saw LPN Kathy Hardrick and Dr.

McCleod.  Plaintiff's mother reported that he was functioning better at home and school, that

his appetite was good but that he was not sleeping well.  Dr. McCleod wrote, "Mother reports

since last visit patient[']s behavior has improved.  He reportedly has not had any anger

outburst or been aggressive this week.  He denies feeling depressed and has not made any

threats to harm himself or others.  He is in the 10th grade at Ashford High School and his

academics are slowly improving.  Mother has not received any complaints from his

teachers."  Dr. McCleod continued plaintiff's medications at the same dosages and again

recommended that his mother get a juvenile probation officer for plaintiff.  She scheduled

plaintiff to return in a month.  (R. 283-84).

     Plaintiff's application for SSI benefits was denied at the initial administrative level

a few days later, on February 7, 2005.  (R. 41-46).  On February 11, 2005, plaintiff returned

16

to his pediatrician for his "well child" examination. Dr. Tamburin noted, under "Past Medical History[,]" "Bipolar Disorder.  Followed Dr. McCleod."[13]  He recorded good appetite and normal sleep habits, and stated that "No issues or concerns were noted during visit."  He noted that plaintiff was to "[c]ontinue under the care of Dr[.] McCleod[.]" (R. 416-17).

On March 3, 2005, plaintiff returned to Dr. McCleod.  Plaintiff's mother "report[ed] since last visit he has had aggressiveness and we changed his Zoloft and 1/2 the Seroquel.[14] The Seroquel was [discontinued] which held his attitude but he has poor sleep."[15]  Dr. McCleod noted, "He has an appt in April for testing [for Bipolar Disorder and learning disability].  He is in the 10th grade at Ashford High School and his academics are slowly improving.  Mother has received complaints from his teachers for missing days and not finishing his assignments.  He has been in alternative school.  He is argumentative and wants it his way.  He got into an argument with the principal for the air conditioning being off." Dr. McCleod changed plaintiff's prescriptions to eliminate his prescription for Seroquel (which plaintiff's mother had reported that he had discontinued), replacing it with Ambien for insomnia.  She continued his prescriptions for Concerta 54 mg in the morning, Zoloft, 75 mg at bedtime, and Focalin, 10 mg, to be taken at 3:00 p.m.  For the third time, she recommended that plaintiff's mother get a juvenile probation officer for the plaintiff, and she

---

[13]  Dr. McCleod's treatment notes, however, did not then and had not previously included any diagnosis of "Bipolar Disorder."  (See R. 246-51, 283-89).

[14]  This medication adjustment actually occurred at the January 27, 2005 visit, not the most recent visit.  (See R. 284, 286, 288).

scheduled plaintiff to return to the clinic in one month.  Plaintiff's diagnoses on Axis I and

Axis II remained unchanged.  Dr. McCleod noted that plaintiff was scheduled for an

appointment on April 8, 2005 with Dr. Wyatt for testing for bipolar disorder and learning

disability.  (R. 281-82).

Late at night on March 15, 2005, plaintiff's mother took him to the emergency room.

He reported that he was having trouble trying to get to sleep, and complained that he was

paranoid, hallucinating and having suicidal thoughts.  Under "Past H[istory]" the intake nurse

wrote, "ADHD, OCD, Anxiety[,] IBS, Borderline Schizophrenia."  (R. 342).[16] The ER

physician indicated that plaintiff was alert, in mild distress, that his mood/affect was normal,

that his orientation was normal, that he was in no respiratory distress and had normal breath

---

[16]  The first indication in the medical evidence before the court that plaintiff was having
hallucinations was in the March 15, 2005 ER report.  At the administrative hearing in September
2006, plaintiff's mother testified that over the previous couple of years she had noticed "[a]n
increase in what they call schizophrenic moods and OCD.  He hears voices and his anger a lot has
increased."  (R. 469).  She further testified as follows:

> Q.  So the thing that, the reason you filed this time was because you noticed an
> increase in the mood?
>
> A.  Yes, ma'am.
>
> Q.  And in, just tell me specifically what was going on at the time that made you go
> down and think I need to go on and refile again?
>
> A. He was hearing voices, and they were telling him to do things psychotic and he
> was wanting to kill himself, and a danger to others in school. . . .

(R. 469).  Plaintiff's mother filed the application for disability in September 2004 (R. 57) and
plaintiff filed his request for a hearing before an ALJ on March 9, 2005 (R. 47), both before
plaintiff's report of hallucinations to the ER staff on March 15, 2005.  Dr. McCleod diagnosed
psychotic disorder for the first time on April 4, 2005, after plaintiff and/or his mother reported
audiovisual hallucinations.  (See R. 279-80, 281-82).

sounds, that his heart rate and rhythm was regular and his heart sounds normal, and that his skin was normal, warm and dry. The physician diagnosed psychosis "[with slight] agitation" and discharged plaintiff to home in stable condition. (R. 342-43). Early the next morning, Dr. Handal referred plaintiff to the hospital for an EEG; plaintiff or his mother had reported "mental status changes with shaking and eyes rolling back." The EEG was normal, "without evidence of seizure activity or persistent focal abnormality. (R. 336-37).

Plaintiff's next office visit with Dr. McCleod was three weeks later, on April 4, 2005. Plaintiff was reportedly functioning poorly at home and school. Dr. McCleod noted, "He was recently in for testing and refused to participate. He was started on Geodon samples at that time and testing was cancelled until further notice."[17] She assessed his status as "Worse," adding "Pt refuses to comply with most recommendation[s]." Dr. McCleod wrote:

> Mother reports that he is worse. He has an attitude, he won[']t go to school, he won[']t do anything you ask. He is not sleeping well and keeping everyone up. Mother reports he continues to have aggressiveness. *He denies AVHall.* Pt states that he is not going to take anymore Geodon. It makes him too sleepy and caused stomach upset. He is in the 10th grade at Ashford High School and . . . may be at risk of failing. Mother has received complaints from his teachers for missing days and not finishing assignments. He has not been in alternative school since last visit. He is argumentative and wants it his way. *He reports AVH* of 7 people around him that talk alot [sic] and one of them tells him to kill himself. *He reports hearing them right now. He reports a VH* of the 7 people with 5 boys and 2 girls. They are adults. He states that they don[']t bother him and they are comforting. Recommend mother get JPO for patient.

---

[17]   It is not apparent from the medical treatment note what kind of "testing" had been attempted; Dr. McCleod's previous office note and this note both reflect that plaintiff had been scheduled to be tested on April 8, 2005 – four days after this appointment – by Dr. Wyatt for bipolar disorder and learning disability. (R. 280, 282).

(R. 279)(emphasis added).  In her mental status examination, Dr. McCleod wrote, "Thought content was *without auditory or visual hallucinations*.  Patient denies suicidal or homicidal ideations, plan or intent.  There was no evidence of delusions.  Insight was good.  Judgment was good."  (Id.)(emphasis added).[18]  She observed, under the heading "Medications," that "*Patient denies* having H/A, palpitations, vomiting, tics, rash, *hallucinations*, constipation, dry mouth, cramps, dizziness, agitation, abnormal movement, sedation, diarrhea, blurred vision."  (Id.)(emphasis added). Dr. McCleod added "Psychotic Disorder, NOS" to plaintiff's list of diagnoses.  She continued plaintiff on Concerta, put his testing with Dr. Wyatt on hold, recommended again that his mother get a juvenile probation officer for the plaintiff and scheduled him to return in one month.[19]  On that same day, Dr. McCleod signed a letter addressed "To whom it may concern[.]" She wrote:

> I am writing this letter on behalf of Dustin Hill, who was recently seen in my clinic for medication management for Obsessive Compulsive Disorder, Mood Disorder, NOS, Mathematics Disorder, Attention Deficit Hyperactivity Disorder, Overanxious Disorder, R/O Expressive Receptive Language Disorder, Psychotic Disorder, NOS, Borderline Intellectual Functioning (FSIQ 72). . . . Currently he is treated with Concerta 54 mg qam. . . .
>
> While I plan to continue to work with Dustin and his family on an outpatient

---

[18]  Dr. McCleod's mental status examination reports remained the same throughout her treatment of the plaintiff.

[19]  Because of the manner in which Dr. McCleod summarized her discussion with plaintiff and his mother, it is difficult to tell whether plaintiff reported to Dr. McCleod that he was – right at that moment, in her office – experiencing hallucinations of seven people, with one of them telling him to kill himself, or whether Dr. McCleod was summarizing the mother's report of a previous hallucination incident reported to the mother, while it was in progress, by the plaintiff.  However, Dr. McCleod noted in three other places in her treatment note for that visit that plaintiff denied hallucinations; she also scheduled him for follow up at the fairly lengthy interval of one month.

basis to stabilize his conditions, he generally refuses most treatment recommendations. I am most concerned with his emotional instability at this time.

Therefore, I respectfully request Dustin Hill be provided with a juvenile probation officer for school refusal and refusal to participate in treatment recommendations.

(R. 379).

Plaintiff next returned to Dr. McCleod on May 20, 2005, more than six weeks later. Plaintiff's mother reported that he was still functioning poorly at home and school. She told Dr. McCleod, "I want to leave the medicine where it is at until school starts back . . . I have been giving him Zoloft again for his anxiety." Although Dr. McCleod's notes indicate that Zoloft might have caused hallucinations (see R. 278, 280 (listing Zoloft under past medications with the annotation "possible AVH")), she continued plaintiff on Concerta, restarted him on Zoloft, recommended that plaintiff's mother get a juvenile probation officer, and scheduled plaintiff to return to the clinic in two months. (R. 277-78).

However, plaintiff did not again seek treatment at Dothan Behavioral Medicine Clinic for over six months. On November 28, 2005, he saw Bailey and Dr. McCleod. He was reported to be "functioning poorly at home and school" but his appetite was good and he was sleeping well. The note states:

Mother reports, "He is not taking anything now. He needs something, but he tried taking the Concerta 54 mg and it gave him tics. We want to try Focalin XR. Mark Kenney is his JPO and he is on probation and does community service.

(R. 275).[20]  Plaintiff's status was assessed as "Worse due to being off of medication for several months."  (Id.).  Dr. McCleod gave plaintiff a fourteen-day prescription for Focalin, and scheduled plaintiff to return in two weeks.  (R. 275-76).

At plaintiff's appointment several days later with LPN Blayne Welch, on December 6, 2005, plaintiff was still reportedly functioning poorly at home and school.  His appetite was "slowing down" and he was "sleeping well" but sleeping "a lot during the day." Plaintiff's mother reported that the Focalin was ineffective and that she wanted to try him on a lower dosage of Concerta.  She also stated that his school was not accommodating his medical needs, and she asked for a letter to "'get him homebound.'" Plaintiff's status was assessed as "Same[.]" His prescription for Focalin was discontinued, he was started on Concerta, this time at a 36 mg dosage, and he was scheduled to return to the clinic in one month.  (R. 273-74).

Plaintiff next returned for treatment six months later, on June 8, 2006, when he was evaluated by Dr. Handal. Plaintiff's mother stated that plaintiff had been off his medication for almost one year. She stated that he was complaining of difficulty concentrating and focusing, and she requested that he be started again on Concerta.  Dr. Handal gave plaintiff

---

[20]  On every visit to Dothan Behavioral Medicine from June 2004 until plaintiff's visit on May 20, 2005, he was given a prescription for Concerta 54 mg.  The treatment notes for those visits indicate that plaintiff denied "tics[.]" (Exhibits 2F, 6F).  Plaintiff's pharmacy records from the Winn-Dixie pharmacy show that plaintiff also filled prescriptions for Concerta 36 mg from late 2000 until mid-2001, when his dosage increased to 54 mg; he filled Concerta prescriptions at the 54 mg dosage regularly at Winn-Dixie until September 2002. (Exhibit 13E).   Treatment notes for plaintiff's office visits in April and May 2005 indicate that he refused to take his prescribed Focalin.  (R. 278, 280).

a 14-day prescription for Concerta, 36 mg, and scheduled him to return in two weeks.  (R.

383-84).[21]   At his two-week follow-up appointment, on June 20, 2006, plaintiff's mother

reported that he had become "more moody," and plaintiff stated that he "feels ill and he can't

control his moods."  Dr. Handal wrote, "This just started since starting new med – Concerta.

Dustin states he feels his heart race when he gets real angry and feels lightheaded when he

stands up."  Dr. Handal discontinued plaintiff's Concerta, gave him a 7-day prescription for

Focalin, and scheduled him to return in a week.  (R. 393-94).[22]   When plaintiff returned a

------

[21]   During the year that he was off of all medication and was not seeking mental health
treatment (other than the November 28, 2005 and December 6, 2005 office visits), plaintiff was in
the eleventh grade. He was tested and determined to be ineligible for special education services; he
had a full scale IQ of 86, within the low average range of intellectual functioning. (Exhibits 4E and
12E).  His school records for that year show that he was performing poorly academically, earning
two Cs and two Fs in the first semester and mostly Ds and Fs in the last half of the school year; he
had between six and ten absences from each of his classes in the third grading period, and between
six and eleven absences for each class in the fourth grading period of the school year.  (Exhibits 5E,
6E, 7E, 15E).  He was placed on probation on September 20, 2005, at the beginning of the school
year, and his juvenile probation officer filed a revocation petition on May 3, 2006 because plaintiff
was skipping school and not making passing grades. (Exhibit 9E).  During this school year, plaintiff
was also performing community service due to his probation.  (Exhibit 8E).  Plaintiff also worked
at Dairy Queen during second semester, from March 9, 2006 until April 10, 2006.  His employer
indicated that he worked part-time as a cook, operating a chain grill, steamer and toaster.  He made
hamburgers and hot dogs and also washed dishes.  Plaintiff's employer made no indication, in
response to a query on the form, that plaintiff received accommodations or help, and she stated that
his employment ended because "[h]e quit[.]" (Exhibit 2D).  Plaintiff worked over 89 hours at Dairy
Queen and, during the same one-month period of time, performed 33.5 hours of community service;
thus, the record shows that he worked a total of over 120 hours outside of the classroom during that
month.  (Exhibits 2D, 8E).  During the previous year, while he was in tenth grade, plaintiff had
received a grade of "66" in Algebra II with Trigonometry during the first semester.  However, he
had earned a grade of C in "Multi Media," Bs in Honors English, Honors U.S. History/Geography,
Environmental Science, Accounting, and Biology, and an A in Driver's Education.  (R. 168).

[22]   Dr. Handal's note also states that plaintiff "[h]ad appointment with Ann Jacobs yesterday.
Mom states it went well.  He is going to have some more testing done there." (R. 393).  There are
no further references to plaintiff's treatment or assessment by Dr. Jacobs in Dr. Handal's notes.
However, plaintiff submitted a two-sentence letter from Dr. Jacobs, dated July 12, 2006 which

week later, his mother stated that "he has been having from 1-3 panic attacks per day beginning on the 2nd or 3rd day after beginning the Focalin . . . Stopped Focalin for 2 days and panic attacks stopped."  Dr. Handal discontinued the Focalin and started plaintiff on Strattera, 40 mg for three days, to be increased to 80 mg thereafter, and scheduled him to follow up in three weeks. (R. 391-92).  Plaintiff returned six weeks later, on August 8, 2006. His mother reported that "he went up to 80 mg of Strattera and was in another world, so he is only on 40 mg now, but I think a 60 mg would be perfect."  Dr. Handal decreased plaintiff's prescription from 80 mg to 60 mg and scheduled him to follow-up in four weeks. (R. 389-90).  On the same day, Dr. Handal wrote a letter to plaintiff's school, listing his diagnoses and his prescription for Strattera, and stating, "Due to the medications that Dustin is on, it may be necessary for him to go to the bathroom more frequently.  I would appreciate your help in making the appropriate accommodations."  (R. 396). The record includes no later treatment records from Dothan Behavioral Medicine Clinic.

At the administrative hearing on September 18, 2006, plaintiff's mother testified that she believes that plaintiff is disabled because "he just has a lot of trouble staying focused and on task, and doing a lot of the normal things other kinds do and it is the constant monitoring even at school.  He is on medication.  We do go to therapy and I say he is unique.  He is just different, and it is hard for him, and it has been hard for the whole family."  (R. 464).  She

---

states, "Dustin Hill came in for diagnostic interview on June 19, 2006.  He has completed a MMPI-A."  (Exhibit B16F).  At the hearing, plaintiff's counsel indicated that "she should be able to get [Dr. Jacobs' records]" (R. 462).  However, plaintiff did not provide any records indicating the testing results or Dr. Jacobs assessment.

further testified as follows:

Plaintiff works at K-Mart, and has been working there for three months.  Each week, he works "[m]aybe eight to 20 hours.  It depends on how he is doing that week and, you know, what they need done."  His only current medication is Strattera.  He has difficulty at school.  He doesn't remember to do his homework or turn in assignments, so she has to correspond daily with his teachers.  He loses money or will not turn it in.  At work, "somebody is there to monitor him and all."  She corresponds with his managers at his job and he has a friend who used to go to school with him and who works with him; they try to assign plaintiff to work with his friend.  He has difficulty staying focused to bathe, brush his teeth, eat or dress.  She picks out his clothes.  He counts things and has to have things in a certain order.  He can't rearrange his room or his schedule.  He gets angry a lot.  She filed for disability this time because he was having an increase in "schizophrenic moods" and was hearing voices "telling him to do things psychotic and he was wanting to kill himself, and a danger to others in school."  (R. 463-70).

Plaintiff then testified as follows:

Because of his OCD he counts channels on the television as he presses the button.  He has to stop at channel 49 and if it does not stop, he has to turn the television off and start over.  He has to set things in the "right spot."  He rearranged the things on the hearing room table because it "looked nasty" and it makes him feel angry when things are out of order. With regard to school, the OCD only affects him as to his desk, and "as long as my desk is right I don't care."  The teachers help him by asking if he needs help with anything.  When

asked about his experience with "the people you have been seeing," plaintiff responded "That was a long time ago . . . . like a year ago."  At his grandmother's house, he saw "a dude" who told him to go outside and go to the bathroom and lock the door.  He described another incident at his house in which he saw people, with one "dude" running down the hall, another running out of his mother's room, and said, "I'd just have to grab a machete or something and stand there.  And they would all start yelling at me."  He was frightened by the experience.  He went to the emergency room when the people were telling him to hurt himself, but he did not want to talk about it.  He has "high anxiety" and his heart beats "real fast" and then he cannot breathe.  He has panic attacks.  He was in Honors and had As and Bs until eleventh grade, when he had a teacher, Ms. McWaters, who gave him a hard time.  He has fun at the mall with his friends but if he goes into a store to try to find a pair of jeans and doesn't know anybody, he has to leave after about five minutes or he gets lightheaded.  He has several friends.  They have been his friends for about five years and he plays hockey with them.  He dates "[s]ometimes when I go out but girlfriends yeah."  He does not have a girlfriend right now.  His teacher helps him with math, but the primary subject in which he requires help is history.  Right now he has an 84 in English, but his mother writes his reports and he just rewrites them.  He "come[s] up with it" but his mother "just has to reword it and make it look good."  If his mother did not help him with his homework, he would not try to complete it, because it would be too much work.  In the past "two or three years" he recalled two  "fights" – in  tenth grade, he got into trouble with a principal (plaintiff's mother stated,

at the hearing, that he "almost beat [her] up")[23] because she grabbed him and wouldn't let him leave, so he walked out of school and to his mother's work. He was in a fight on the bus in eighth or ninth grade. He does not get into fights now. His lower back hurts sometimes when he is playing hockey. (R. 470-92).

On October 24, 2006, Dr. Handal completed a mental impairment questionnaire, indicating that plaintiff is markedly limited in the domains of acquiring and using information, attending and completing tasks, and interacting and relating with others; moderately limited in caring for himself, and slightly limited in the domains of health and physical well-being and moving about and manipulating objects. When asked to "describe the *clinical findings* including results of mental status examination that demonstrate the severity of [his] patient's mental impairments and symptoms," (R. 436, emphasis in original) Dr. Handal wrote, "Problems with concentration, focus, impulsivity, defiance, moodiness, anxiety and psychosis." He stated that plaintiff's prognosis is fair, and that Strattera controls his ADHD symptoms. (Exhibit AC-2).

Dr. Handal's Functional Assessment

In finding that Dr. Handal's functional assessment did not provide a basis for changing the ALJ's decision, the Appeals Council noted that Dr. Handal's opinion is unsupported by clinical findings and that it is inconsistent with the global assessment of functioning score of 65 which Dr. Handal assigned and which indicates mild symptoms.

---

[23] Dr. McCleod's treatment notes for March 3, 2005 state that "[plaintiff] got into an argument with the principal[.]" (R. 281).

Plaintiff argues that Dr. Handal's "MRFC assessment is supported by the objective medical evidence and shows that Dustin is disabled." (Plaintiff's brief, p. 13). He does not, however, direct the court to any specific objective medical evidence of record. He argues that the GAF score of 65 reflects only plaintiff's highest level in the past year, that "the record reflects that his GAF has varied but on most occasions ranged from 51-60,"[24] that the GAF scores do not have a direct correlation to the severity requirements of the listings and that the GAF score is not sufficient to find that Dr. Handal's MFRC is not supported by his own records. (Plaintiff's reply brief, pp. 2-3).

The court agrees that the GAF scores do not have a direct correlation to the severity requirements of the listings and, further, that the GAF score assigned by Dr. Handal would not be sufficient, standing alone, to discredit his opinion. However, the Appeals Council first observed that Dr. Handal's functional assessment is not supported by clinical findings. In the form itself, Dr. Handal was asked to describe the clinical findings "including results of mental status examinations" that demonstrate the severity of plaintiff's symptoms; he responded, ""Problems with concentration, focus, impulsivity, defiance, moodiness, anxiety and psychosis." (R. 436). He checked boxes to indicate that plaintiff's "signs and symptoms" include impairment in impulse control, generalized persistent anxiety, mood disturbance, difficulty thinking or concentrating, hyperactivity, emotional lability, and easy distractibility.

---

[24] This particular argument is inaccurate – plaintiff's GAF was most often assessed at "70" over the course of his treatment reflected in the record – and it is also not particularly helpful to the plaintiff since, as Dr. Handal notes in his treatment record, a GAF score of 51-60 is indicative of moderate symptoms or moderate difficulty in social, occupational or school functioning. (See e.g., R. 384).

(Id.).

The court notes that "[p]roblems with concentration, focus, impulsivity, defiance, moodiness, anxiety and psychosis" were reported to Dr. Handal or others in his practice at various times by plaintiff's mother and the plaintiff,[25] but they were not included in Dr. Handal's assessment of the plaintiff's mental status during his office visits.  Dr. Handal did not personally treat the plaintiff for much of the relevant time period.  He saw plaintiff in June 2006, after plaintiff had been off of his medication and out of mental health treatment, except for a single week, for a period of a year.  On June 8, 2006, plaintiff complained of "difficulty concentrating and focusing." Dr. Handal recorded his mental status examination results – even though plaintiff had been off of medication for a year – as follows:

> Mental Status Exam:
>         Behavior: appropriate, cooperative.  Appearance: casual, looks stated age.  Speech: normal.  Mood: Euthymic.[26]  Thought Process: Logical, coherent, goal-directed.  Thought Content: Denies suicidal/homicidal ideations, not delusional, Denies auditory or visual hallucinations. Perception: denies hearing voices, denies seeing things.  Orientation: oriented to time, oriented to place, oriented to person.  Insight: appropriate.  Judgment: Good. Memory:  Intact.  Intelligence: Intelligence seems to be average based on vocabulary.  Eye Contact Good.

(R.  383).

On June 20th, June 27th, and August 8,2006, Dr. Handal's mental status examination results were identical to those quoted above from his June 8th notes.  (R. 389, 391, 393).  The

---

[25] As noted below, the ALJ found the plaintiff's and his mother's statements to be less than fully credible, and his credibility assessment is supported by substantial evidence of record.

[26] A euthymic mood is moderate, not manic or depressed. *Stedman's Medical Dictionary* (26th ed. 1995) at p. 606.

letter Dr. Handal signed on August 8, 2006 noted that it may be necessary for plaintiff to go to the bathroom more frequently "[d]ue to the medications that Dustin is on" and it did not indicate that any other accommodation was requested or necessary.  (R. 396).[27]  Plaintiff submitted no later treatment records from Dr. Handal.  Although plaintiff's mother reported many problems to the psychiatrists and other staff at Dr. Handal's practice, none of the observations recorded in the earlier mental status examinations by the other practitioners support Dr. Handal's October 24, 2006 opinion of disabling functional limitations.  Dr. McCleod and other practitioners at Dothan Behavioral Medicine consistently reported mental status examinations which were unremarkable. (See Exhibits 2F and 6F).

As to the "psychosis" which Dr. Handal listed as a "clinical finding" on the mental RFC form, plaintiff's complaints of hallucinations are evidenced in the medical records only over a very brief time period, from mid-March to early April 2005, a year and a half before Dr. Handal completed the form.  Plaintiff testified at the September 2006 administrative hearing that his hallucinations had taken place "a long time ago . . . like a year" previously. On the one occasion on which plaintiff sought treatment  immediately following a hallucination, his mental status at the emergency room was recorded to be normal, with the doctor noting only slight agitation, and plaintiff was not admitted for inpatient treatment but was discharged from the ER in stable condition.  (R. 343).  When plaintiff reported the

---

[27]  Plaintiff's mother stated at the hearing that "[h]e has a bathroom excuse from Dr. Handal that allows him to go if he has a panic attack or something." (R. 476).  While plaintiff clearly could use the "bathroom excuse" for this purpose, Dr. Handal's letter states that plaintiff's need to go to the bathroom more frequently is due to his medication – not to panic attacks.  (R. 396).

hallucinations to Dr. McCleod on April 4, 2005, his "mental status examination" results were also unremarkable, and – while Dr. McCleod professed in a letter she signed on that day to being "most concerned with his emotional stability" – she scheduled him to "[r]eturn in one month." (R. 279-80). Additionally, plaintiff's mother does not even allege that plaintiff has functional limitations in moving about and manipulating objects (see R. 64, indicating that plaintiff's physical abilities are limited only to the extent that he cannot drive a car or play sports; indicating that he is able to throw a ball, ride a bike, jump rope, and work video game controls), and there is no indication in the treatment notes from Dothan Behavioral Medicine or elsewhere in the record that plaintiff has any difficulty in moving about or in manipulating objects. In his mental RFC form, however, Dr. Handal found plaintiff to be limited in this domain, although he found the limitation to be "slight." (R. 393). Further, Dr. Handal indicates on the first page of the questionnaire in response to the query "treatment and response" – "Strattera 60 mg QD – control[]s ADHD [symptoms.]" (R. 433). Without any further explanation, Dr. Handal's determination that plaintiff's medications control his ADHD symptoms appears to be inconsistent with his opinion, expressed on the following page, that plaintiff is markedly limited in the domain of attending and completing tasks. (R. 433-34).

Additionally, some of the diagnoses indicated on Dr. Handal's RFC form are not supported by any clinical findings or observations which are included in the mental health treatment records before the court. Plaintiff has carried a diagnosis of "mathematics disorder" and a "rule out" diagnosis of "expressive language disorder" at all times in the

Dothan Behavioral Medicine records included in the administrative transcript.  (See Exhibits 2F, 6F, 13F).  However, underlying clinical findings or objective test results to support these diagnoses – while they may be included in earlier medical records not submitted to the Commissioner and not before the court – are not evidenced in the treatment notes from Dr. Handal's clinic from 2004 through 2006, and those records include no indication of the particular functional limitations imposed by the disorder(s).

Accordingly, the court concludes that, even without considering Dr. Handal's GAF assessment of 65 and the other GAF assessments of record, the Appeals Council's other stated reason for discrediting Dr. Handal's RFC opinion – that the opinion is not supported by clinical findings – provides "good cause" for rejecting the opinion and is supported by substantial evidence.[28]

<u>Substantial Evidence Supports the ALJ's Findings</u>

In finding the statements of plaintiff's mother and the plaintiff to be less than fully credible, the ALJ noted that "the record reveals that [plaintiff's] treatment, when he takes his medications as prescribed, has been generally successful in controlling those symptoms," that plaintiff plays hockey with his friends and that he has worked at K-Mart for three months. (R. 23).  The ALJ observed that the records from Dothan Behavioral Medicine Clinic show

---

[28]  See <u>Carson v. Commissioner of Social Security</u>, 2010 WL 1544734, 2 (11th Cir. Apr. 20, 2010)(unpublished opinion)(Commissioner "may reject the opinion of any physician when the evidence supports a contrary conclusion")(citation omitted).  Even if Dr. Handal's RFC assessment were accepted at face value, he renders no opinion on whether plaintiff's disabling functional limitations satisfied the duration requirement of the Act.

that plaintiff's condition improved with treatment and that plaintiff does well on his medications but that, beginning with the office note on April 4, 2005, plaintiff refused to comply with treatment recommendations and his condition worsened because he would not take his medication.  The ALJ further notes the positive mental status examination results recorded by Dr. Handal in his office notes for June 20, 2006 and August 8, 2006, and that Dr. Handal assigned plaintiff a GAF score of 51-60, indicating moderate symptoms or moderate difficulty in social, occupational, or school functioning.  (R. 24).  The ALJ determined that the records from Dothan Behavioral Medicine Clinic demonstrated that plaintiff's "condition is due, at least in part, to his non-compliance with prescribed medication[.]" (R. 25).  This observation is well-supported by the evidence.

As noted above, plaintiff does not identify any particular legal error in his brief, arguing instead that the evidence demonstrates that he is markedly impaired in three of the domains.  In the domain of acquiring and using information, the ALJ found that plaintiff is limited but at a "less than marked" level, noting that while plaintiff functions at a low-average intellectual level, his work history and his grades in school indicate that his impairment is less than marked.  Plaintiff cites his mother's testimony about his limitations, his performance during the consultative evaluation by Dr. Jacobs, and his diagnoses of mathematics disorder which "is diagnosed in those whose mathematical abilities are well below the expected level for their age."  The court notes, again, that the ALJ found plaintiff's mother's allegations to be less than fully credible; that finding is supported by the record.  Additionally, plaintiff's report cards for the period at issue show that while his math grades

33

were not good, he had Cs in Algebra and Geometry and passed Algebra II with Trigonometry

with a 66.  (R. 169).  Additionally, plaintiff was able to hold his job at Dairy Queen with no

accommodations and his employment ended because he quit; at the time of the hearing,

plaintiff had worked at K-Mart for three months.  The ALJ's finding of a less than marked

impairment in this domain is supported by substantial evidence.

The ALJ found plaintiff's limitation in the domain of interacting and relating with

others to be less than marked.  Claimant and his mother both reported, at different times, that

he does not have any friends.  The ALJ noted, however, that "plaintiff testified that he has

a number of friends with whom he plays hockey, and that he has girlfriends."  The testimony

of plaintiff (with interjection by his mother) at the hearing indicated that he has several

friends, he has had those friends for about five years, he has dated girlfriends, he has fun and

is fine at the mall so long as he is there with his friends, and he no longer gets into fights.

Additionally, as discussed previously, the medical record includes several instances in which

plaintiff sought treatment for injuries he incurred while engaging in sports with others.[29]

While plaintiff has some limitation in this domain – as acknowledged by the ALJ – the ALJ's

determination that his limitation is less than marked is supported by substantial evidence.

As discussed above, a finding of functional equivalence results when a plaintiff has

"marked" limitations in two or more domains or an "extreme" limitation in one domain.  The

---

[29]  In view of the evidence of record and the testimony at the hearing, it is surprising that plaintiff continues to rely on his mother's report that he has no friends his own age and Dr. Jacobs observation (based on what plaintiff had told him during the evaluation) that "Dustin does not participate in sports and 'seems to have no friends of his age.'" (See Plaintiff's brief, p. 10).

court finds that the ALJ's findings that plaintiff's limitations are "less than marked" in the domains of "acquiring and using information" and "interacting and relating with others" are supported by substantial evidence.   Plaintiff does not challenge the ALJ's findings that he had either no limitation or a less than marked limitation in the domains of "moving about and manipulating objects," "caring for himself," and "health and physical well-being," and he does not contend that his limitation in the domain of "attending and completing tasks" is "extreme."[30]   (Plaintiff's brief, pp. 7-11).  Accordingly, the court does not reach the issue of whether the ALJ's finding that plaintiff has a less than marked impairment in the final remaining domain of attending and completing tasks is supported by substantial evidence. The court concludes, based on its consideration of all of the evidence of record, that the ALJ's finding that plaintiff does not have limitations which meet, medically equal, or functionally equal the listings is supported by substantial evidence.

## CONCLUSION

Upon review of the record as a whole, the court concludes that the Commissioner's decision is supported by substantial evidence and proper application of the law and that it is, accordingly, due to be affirmed.  A separate judgment will be entered.

Done, this 14th day of September, 2010.

/s/ Susan Russ Walker
SUSAN RUSS WALKER
CHIEF UNITED STATES MAGISTRATE JUDGE

---

[30] Plaintiff argues that, in this domain, he "suffers from a 'marked' limitation."  (Plaintiff's brief, p. 7).